IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

REBECCA GEEDY,

: Civil No. 1:24-CV-1674

    Plaintiff,

            v.

: (Judge Saporito)

LELAND DUDEK, Acting
Commissioner of Social Security,[1]

: (Chief Magistrate Judge Bloom)
:
:
:

    Defendant.

:

## REPORT AND RECOMMENDATION

## I. Introduction

Rebecca Geedy filed an application under Title II of the Social Security Act for disability and disability insurance benefits on October 30, 2018.  Following an initial hearing before an Administrative Law Judge ("ALJ"), the ALJ found that Geedy was not disabled from her alleged onset of disability, June 13, 2016, through September 30, 2019, the date she was last insured.  The plaintiff appealed the final decision in that matter to this court, which remanded the case for a second

---

[1] Leland Dudek became the Acting Commissioner of the Social Security Administration on February 19, 2025.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Leland Dudek is substituted as the defendant in this suit.

hearing by an ALJ with specific instructions to consider the limitations set forth in a medical opinion provided by Dr. Schnepp, a state agency consultant. (Tr. 397-413). The ALJ held a second hearing on Geedy's application, after which he again denied her claim, finding that she was not disabled during the June 13, 2016, through September 30, 2019, alleged disability period.

Geedy now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence. After a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019), we conclude that substantial evidence supports the ALJ's findings in this case. Therefore, we will affirm the decision of the Commissioner denying this claim.

## II. <u>Statement of Facts and of the Case</u>

Rebecca Geedy filed for disability and disability insurance benefits, alleging disability due to depression, panic attacks, agoraphobia, and severe anxiety. (Tr. 56). Geedy was 32 years old at the time of her alleged

onset of disability, had at least a high school education, and had past relevant work as a newspaper deliverer. (Tr. 56, 338-39).

The medical record regarding Geedy's impairments revealed that Geedy established care with Dr. Lindsay Michael, D.O., in January of 2018, citing depression as her primary concern. (Tr. 204). She also reported experiencing anxiety and panic attacks when leaving her home or going to a large shopping center. (*Id.*). Dr. Michael noted a depressed mood and stress, but no symptoms of decreased concentration, self-injury, or suicidal ideas. (Tr. 205). In March, Geedy reported improved depression but not anxiety, and that she tried going back to work but stopped due to having a panic attack. (Tr. 210). Geedy presented as nervous and anxious but had a normal mood, affect, behavior, judgment, and thought content on examination. (Tr. 210-11).

Geedy treated with Dr. Michael in August of 2018, at which time she reported increased anxiety and difficulty sleeping due to excessive worry. (Tr. 218). A mental status examination was unremarkable, and Dr. Michael increased her dose of Celexa. (Tr. 219). In September, Geedy denied any depression symptoms and reported some improvement in her

anxiety. (Tr. 221). However, in October, Geedy reported that her depression was worse than her anxiety. (Tr. 224). Dr. Michael started Geedy on trazadone at night to help with her sleep issues. (Tr. 225). By November, Dr. Michael noted that Geedy's anxiety was stable but that her depression was uncontrolled, and Geedy was referred to a new psychiatrist. (Tr. 229).

In February of 2019, Geedy reported her depression was stable but that her anxiety was worsening. (Tr. 243). A mental status examination revealed that Geedy was anxious and nervous, but she exhibited a normal mood, affect, behavior, judgment, and thought content. (Tr. 246). It was noted that Geedy wanted to establish care with a new therapist. (Tr. 247). Geedy began treating with Ruth Kovacs, MS, in March at Franco Psychological Associates. (Tr. 285). An initial evaluation noted that Geedy had a cooperative attitude, depressed and anxious mood, blunted affect, intact thought processes, and intact memory, judgment, and cognitive function. (*Id.*). This evaluation also indicated that Geedy experienced moderate limitations in several areas of functioning, including occupation, family, and interpersonal limitations. (*Id.*).

4

Treatment notes from April indicate that Geedy was working on driving herself places, and that she wanted to be able to take her kids to the park. (Tr. 283).  In June, she reported that her depression and anxiety were worse, but that she was able to drive to the farmer's market.  (Tr. 276). In July, Kovacs noted that Geedy drove herself to her appointment for the second time, and further reported driving to Giant and another store that week.  (Tr. 273).  Kovacs noted an improved mood at this visit.  (*Id.*). In August, Geedy reported shopping for school clothes and supplies with her children.  (Tr. 271).

Around this time, Geedy also treated with PA-C Maame-Esi Menyah at Franklin Family Services.  In July of 2019, Menyah diagnosed Geedy with Bipolar II disorder and agoraphobia without panic disorder. (Tr. 305).  Geedy reported worsening depression, difficulty sleeping, overthinking, and an intense fear of public places and crowds.  (Tr. 302). A mental status examination revealed a euthymic mood, cooperative attitude, good word comprehension, intact associative thinking, and intact memory, attention, and concentration.  (Tr. 303-04).  In August, Geedy reported that her depression was manageable, and her mood was

good.  (Tr. 300).  A mental status examination at this visit was unremarkable.  (*Id.*).  Treatment notes from September indicate Geedy experienced increased anxiety with her child starting preschool and anticipating the anniversary of a friend's death.  (Tr. 296).

PA-C Menyah completed a mental residual functional capacity statement for Geedy in September of 2019.  (Tr. 233-37).  Menyah opined that Geedy would experience performance preclusive limitations up to 15 percent of the time with respect to completing a normal workday and work week without interruptions and responding appropriately to changes in the work setting.  (Tr. 234-35).  Menyah further opined that Geedy would experience performance preclusive limitations up to ten percent of the time regarding her ability to understand and remember detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine without special supervision; make simple work-related decisions; and interact with the general public.  (*Id.*).  This opinion further stated that Geedy would be off task up to five percent of the day and miss four days of work per month.  (Tr. 236).

Ruth Kovacs completed a similar medical source statement in October of 2019. (Tr. 238-42). Kovacs opined that Geedy would experience performance preclusive limitations up to 15 percent of the time in her ability to understand and remember short and simple instructions and to complete a normal workday and work week without interruption. (*Id.*). She further opined that Geedy would experience performance preclusive limitations more than 15 percent of the time in her ability to maintain attention and concentration for extended periods of time and respond appropriately to changes in the work setting. (*Id.*). This statement further asserted that Geedy would be off task 30 percent of the time and would be absent from work five or more days per month. (Tr. 241). Both Menyah and Kovacs opined that Geedy would be able to work full time on a sustained basis less than 50 percent of the time. (Tr. 236, 241).

Treatment notes from after Geedy's date last insured indicate that in January of 2020, Geedy reported to PA-C Menyah that she "[g]ets down" but that her holidays were good, she drove to a celebration of life by herself, and she dealt with anxiety while holiday shopping. (Tr. 612).

7

A mental status examination revealed a normal mood, clear thought processes, grossly intact attention and concentration, and intact memory. (*Id.*).  Around this time, Geedy reported to another provider at UPMC that her depression and anxiety were stable and well-controlled.  (Tr. 679).  In May, Menyah noted Geedy was home with her children during the lock down orders, but that she bought a trampoline and walked daily. (Tr. 610).  Geedy reported her anxiety was well-controlled, she went out in public more, and went grocery shopping.  (*Id.*).  However, Geedy reported to another provider that she was experiencing worsening anxiety due to the township telling her she could not keep her trampoline. (Tr. 687).

In August of 2020, treatment notes from UPMC indicate that Geedy reported her anxiety and depression as well-controlled.  (Tr. 629).  While she presented with a depressed mood, she did not exhibit decreased concentration, agitation, or behavioral problems.  (Tr. 630).  By November, Geedy was discharged from Franklin Family Services due to noncompliant attendance.  (Tr. 609).  Treatment notes from UPMC in April and July of 2021 noted that Geedy experienced periods of worsening

anxiety, but other than a dysphoric mood, her mental status examinations were unremarkable. (Tr. 638-39, 647-49).

It is against the backdrop of this record that an ALJ held the initial hearing on Geedy's disability application on December 16, 2019. (Tr. 27-54). Geedy and a Vocational Expert both appeared and testified at this hearing. (*Id.*). Following this hearing, on January 17, 2020, the ALJ issued a decision denying Geedy's application for disability benefits. (Tr. 9-26). That decision was remanded by Magistrate Judge Arbuckle with specific instructions for the ALJ to consider the limitations set forth in Dr. Schnepp's opinion. (Tr. 397-413). The ALJ held a second hearing on June 7, 2023. (Tr. 345-64). Following that hearing, on July 14, 2023, the ALJ again denied Geedy's application for benefits. (Tr. 322-44).

In the decision underlying this appeal, the ALJ first concluded that Geedy had not engaged in substantial gainful activity from her alleged onset date, June 13, 2016, through the date she was last insured, September 30, 2019. (Tr. 327). At Step 2 of the sequential analysis that governs disability claims, the ALJ found that Geedy suffered from severe impairments of depression and anxiety. (*Id.*). At Step 3, the ALJ

concluded that none of these impairments met or equaled the severity of a listed impairment under the Commissioner's regulations. (Tr. 328-31). Specifically, the ALJ found that Geedy experienced only mild to moderate limitations in the four broad areas of social functioning. (*Id.*).

> Between Steps 3 and 4, the ALJ then concluded that Geedy:

> [H]a[d] the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to simple, repetitive, routine tasks but cannot work at production rate pace. She is limited to occasional interaction with the public and supervisors and to a low stress job, which is defined as few workplace changes.

(Tr. 331).

In reaching this RFC determination, the ALJ considered the objective medical record detailed above, the medical opinion evidence, and Geedy's reported symptoms. With respect to the medical opinion evidence, the ALJ considered the 2018 opinion from Dr. Schnepp, which limited Geedy to simple, routine, unskilled work, *i.e.* one-or-two-step tasks, and found this opinion persuasive. (Tr. 334-35). The ALJ reasoned that Dr. Schnepp's opinion was supported by and consistent with the objective clinical findings in the record showing normal mood and affect,

normal thought content, and good insight and judgment. (*Id.*). The ALJ also noted that Dr. Schnepp's opinion was supported by his notations of moderate functioning in several areas, including the ability to remember and carry out detailed instructions; maintain attention and concentration for extended periods; maintain regular attendance; and perform activities within a schedule, among others. (Tr. 335). The ALJ further reasoned that this opinion was consistent with the objective evidence showing routine conservative treatment and medication management. (*Id.*).

The ALJ also considered the opinion of PA-C Menyah and found this opinion partially persuasive. (Tr. 335-36). The ALJ noted Menyah's opinion that Geedy would have no more than ten percent performance preclusion in several areas of functioning, such as maintaining regular attendance and punctuality, sustaining an ordinary routine, and making simple decisions, was supported by the objective clinical findings showing unremarkable mental status examinations. (Tr. 335). The ALJ then noted that Menyah's opinion that Geedy would have up to 15 percent performance preclusion in completing a normal workday and workweek,

among other findings, was not supported by the objective medical evidence or by Geedy's activities of daily living. (Tr. 335-36). The ALJ further noted the limited period of time in which Geedy treated with this provider, as well as the lack of objective support for findings such as excessive absenteeism. (Tr. 336).

The ALJ considered the opinion of MS Kovacs and found this opinion not persuasive. (Tr. 336). The ALJ reasoned that Kovacs' more restrictive limitations were not consistent with the records prior to Geedy's date last insured, which showed generally normal functioning despite an anxious and depressed mood at times. (*Id.*). The ALJ further noted that the restrictions in this opinion were inconsistent with Geedy's activities of daily living, such as her ability to care for her three children, shop, drive, perform household chores, and handle her finances. (*Id.*). The ALJ reasoned that Kovacs' restrictive limitations were not supported by her own treatment notes, which documented no cognitive abnormalities, including in the areas of memory and concentration. (*Id.*). The ALJ also noted that Kovacs' limitation regarding absenteeism,

similar to Menyah's, was not supported by the objective medical records showing no behavioral abnormalities. (*Id.*).

With respect to Geedy's symptoms, the ALJ found that Geedy's statements concerning the intensity, persistence, and limiting effects of her impairments were not entirely consistent with the medical evidence. (Tr. 332-33). At the first hearing, Geedy testified that she experienced three to four panic attacks per day, lasting roughly 30 minutes. (Tr. 34). She reported that her anxiety was triggered by going out in public, going to the store, or talking in front of people. (Tr. 33-34). She testified that she rarely drove places except to take her kids to the bus stop. (Tr. 36). Geedy reported taking care of her youngest child and performing household chores during the day. (Tr. 38-39). She further stated that she tried to obtain a job, but that she had a panic attack in the parking lot and could not go into the store. (Tr. 41). At the second hearing, Geedy reported that she was no longer able to go into stores because of her

anxiety; that her panic attacks had increased[2]; and that she is no longer attending family gatherings. (Tr. 350-52).

The ALJ found Geedy's statements regarding her alleged debilitating symptoms were not persuasive or supported by the objective medical evidence. (Tr. 333). The ALJ noted that Geedy's examination findings during the relevant time were generally normal; that while she testified to experience three to four panic attacks per day, she did not report the same to her medical providers; that her treatment was routine and conservative, consisting of counseling and medication management; and that her activities of daily living supported a higher degree of functioning than she alleged. (*Id.*).

Having made these findings, the ALJ found at Step 4 that Geedy was to perform her past work as a newspaper deliverer. (Tr. 337-38). The ALJ also alternatively found at Step 5 that Geedy could perform the occupations of sexton, janitor; laundry worker II, and potato chip sorter.

---

[2] Curiously, Geedy testified at the second hearing that her panic attacks increased to four-to-five times per week since December of 2019. (Tr. 352). But at the first administrative hearing in December of 2019, Geedy reported experiencing three to four panic attacks per day. (Tr. 34).

(Tr. 339).   Accordingly, the ALJ found that Geedy had not met the stringent standard prescribed for disability benefits and denied her claim.  (Tr. 339-40).

This appeal followed.  On appeal, Geedy argues that the ALJ's RFC determination and consideration of the medical opinion evidence is not supported by substantial evidence, and that the ALJ erred in finding Geedy could perform her past work.  This case is fully briefed and is therefore ripe for resolution.  For the reasons set forth below, we will affirm the decision of the Commissioner.

## III.  Discussion

### A. Substantial Evidence Review – the Role of this Court

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.   *See* 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might

15

accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).    Substantial evidence means less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

A single piece of evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted).    However, where there has been an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).    The court must "scrutinize the record as a whole" to determine if the decision is supported by substantial evidence. *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such

16

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Under this standard, we must look to the existing administrative record to determine if there is "'sufficient evidence' to support the agency's factual determinations." *Id.* Thus, the question before us is not whether the claimant is disabled, but rather whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was based upon a correct application of the law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

17

When conducting this review, we must remain mindful that "we must not substitute our own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)).  Thus, we cannot re-weigh the evidence.  Instead, we must determine whether there is substantial evidence to support the ALJ's findings.  In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision.  *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000).  This does not require the ALJ to use "magic" words, but rather the ALJ must discuss the evidence and explain the reasoning behind his or her decision with more than just conclusory statements.  *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted).  Ultimately, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests."  *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

18

**B.** <u>Initial Burdens of Proof, Persuasion, and Articulation for the ALJ</u>

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a). This requires a claimant to show a severe physical or mental impairment that precludes him or her from engaging in previous work or "any other substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she is under retirement age, contributed to the insurance program, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination, the ALJ follows a five-step evaluation. 20 C.F.R. §§404.1520(a), 416.920(a). The ALJ must

sequentially determine whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also determine the claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1).  In making this assessment, the ALJ must consider all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).  Our review of the ALJ's determination of the plaintiff's RFC is deferential, and that determination will not be set aside if it is supported by substantial evidence.  *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

The claimant bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents him or her from engaging in any past relevant work. *Mason*, 994 F.2d at 1064. If met, the burden then shifts to the Commissioner to show at Step 5 that there are jobs in significant numbers in the national economy that the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

With respect to the RFC determination, courts have followed different paths when considering the impact of medical opinion evidence on this determination. While some courts emphasize the necessity of medical opinion evidence to craft a claimant's RFC, *see Biller v. Acting Comm'r of Soc. Sec.,* 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013), other courts have taken the approach that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006). Additionally, in cases that involve no credible medical opinion evidence, courts have held that "the proposition that an

21

ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

Given these differing approaches, we must evaluate the factual context underlying an ALJ's decision.  Cases that emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where well-supported medical sources have found limitations to support a disability claim, but an ALJ has rejected the medical opinion based upon an assessment of other evidence. *Biller*, 962 F. Supp. 2d at 778–79.  These cases simply restate the notion that medical opinions are entitled to careful consideration when making a disability determination.  On the other hand, when no medical opinion supports a disability finding or when an ALJ relies upon other evidence to fashion an RFC, courts have routinely sustained the ALJ's exercise of independent judgment based upon all the facts and evidence. *See Titterington*, 174 F. App'x 6; *Cummings,* 129 F. Supp. 3d at 214–15. Ultimately, it is our task to determine, considering the entire record,

whether the RFC determination is supported by substantial evidence. *Burns,* 312 F.3d 113.

## C. Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The plaintiff filed this disability application in October of 2018 after Social Security Regulations regarding the consideration of medical opinion evidence were amended. Prior to March of 2017, the regulations established a hierarchy of medical opinions, deeming treating sources to be the gold standard. However, in March of 2017, the regulations governing the treatment of medical opinions were amended. Under the amended regulations, ALJs are to consider several factors to determine the persuasiveness of a medical opinion: supportability, consistency, relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c).

Supportability and consistency are the two most important factors, and an ALJ must explain how these factors were considered in his or her written decision. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *Blackman v. Kijakazi*, 615 F. Supp. 3d 308, 316 (E.D. Pa. 2022). Supportability means "[t]he more relevant the objective medical evidence and

supporting explanations . . . are to support his or her medical opinion(s) . . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). The consistency factor focuses on how consistent the opinion is "with the evidence from other medical sources and nonmedical sources." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

While there is an undeniable medical aspect to the evaluation of medical opinions, it is well settled that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). When confronted with several medical opinions, the ALJ can choose to credit certain opinions over others but "cannot reject evidence for no reason or for the wrong reason." *Mason*, 994 F.2d at 1066. Further, the ALJ can credit parts of an opinion without giving credit to the whole opinion and may formulate a claimant's RFC based on different parts of different medical opinions, so long as the rationale behind the decision is adequately articulated. *See Durden v. Colvin*, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016). On the other hand, in cases where no medical opinion credibly supports the claimant's

allegations, "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings*, 129 F. Supp. 3d at 214–15.

## D. The ALJ's Decision is Supported by Substantial Evidence.

Our review of the ALJ's decision denying an application for benefits is significantly deferential. Our task is simply to determine whether the ALJ's decision is supported by substantial evidence in the record; that is "only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154. Judged against this deferential standard of review, we conclude that substantial evidence supported the ALJ's decision in this case.

The plaintiff first challenges the ALJ's consideration of Dr. Schnepp's opinion, arguing that the ALJ failed to include limitations from this opinion, which he found persuasive. The plaintiff asserts that the RFC in the instant decision is identical to the previous decision that was remanded, and as such, the ALJ erred in failing to include certain limitations. However, as the Commissioner points out, while the RFC determination may be identical, the analysis of Dr. Schnepp's opinion is

not.  In the instant decision, the ALJ considered the specific findings mentioned by Judge Arbuckle on remand, including the moderate limitations in maintaining attention and concentration for extended periods of time, staying on schedule, and completing a normal workday without interruption.  (Tr. 335).  The ALJ noted that Dr. Schnepp's limitation to simple, routine tasks, *i.e.*, one-to-two-step tasks, was supported by these findings as well as the other objective evidence, which documented largely normal mental status examination findings.  (*Id.*). The ALJ also found that Dr. Schnepp's opinion was consistent with Geedy's history of routine and conservative treatment for her mental health impairments.  (*Id.*).

With respect to any limitations concerning Geedy's ability to complete a normal workday without interruption, while the ALJ did not specifically consider this in the context of Dr. Schnepp's opinion, he did consider it when discussing the opinions of Menyah and Kovacs. Specifically, the ALJ found that such a limitation was not supported by the objective evidence, which largely documented normal mental status findings.  (Tr. 335-36).  Indeed, as the ALJ noted, Geedy denied

concentration issues throughout the relevant period, and her mental status examinations consistently showed intact attention and concentration. (*See e.g.*, Tr. 332-34). He further reasoned that such a limitation was not consistent with Geedy's reported activities of daily living, such as caring for three children, performing household chores, driving, shopping, and handling her finances. (*Id.*). Accordingly, reading the ALJ's decision as a whole, *see Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004), we find that the ALJ's consideration of the limitations set forth in Dr. Schnepp's opinion, as well as the other medical opinion evidence, is supported by substantial evidence.

Geedy also asserts that the ALJ erred in finding she could perform her past work as a newspaper deliverer. However, even if we were to conclude there was an error at Step 4, any error is harmless since the ALJ made an alternative finding at Step 5 that Geedy could perform other work in the national economy. Social Security appeals are subject to harmless error analysis. *See Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016). Under the harmless error analysis, a remand is warranted only if the error "prejudices a party's 'substantial

rights'"; that is, if the error "likely affects the outcome of the proceeding, . . ." *Hyer v. Colvin*, 72 F. Supp. 3d 479, 494 (D. Del. 2014).

Here, we cannot conclude that any error at Step 4 likely affected the outcome of Geedy's disability application, since the ALJ found at Step 5 that there were at least three other occupations that Geedy could perform in the national economy. *See e.g.*, *Baines v. Astrue*, 781 F. Supp. 2d 228, 237 (D. Del. 2011) ("Erroneous step four findings can be rendered harmless by the identification of other work consistent with a plaintiff's RFC at step five[.]"). The plaintiff does not challenge the ALJ's findings at Step 5. Accordingly, any error at Step 4 would be harmless, and a remand is not required.

Although the record in this case contained some abnormal findings during the relevant period, we are not permitted at this stage to reweigh the evidence, *Chandler*, 667 F.3d at 359, and instead must simply determine whether the ALJ's decision was supported by "substantial evidence." *Biestek*, 139 S. Ct. at 1154. Given that the ALJ considered all the evidence and adequately explained his decision for including or discounting certain limitations as established by the evidence, we find no

28

error with the decision.   Therefore, under the deferential standard of review that applies to appeals of Social Security disability determinations, we conclude that substantial evidence supported the ALJ's evaluation of this case, and this decision should be affirmed.

## IV.   Recommendation

For the foregoing reasons, IT IS RECOMMENDED that the decision of the Commissioner in this case be affirmed, and the plaintiff's appeal denied.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her

29

discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 22nd day of April 2025.

_s/ Daryl F. Bloom_
Daryl F. Bloom
Chief United States Magistrate Judge

30